AUDREY LANE *v.* T. L. PIPPIN *et al.*

(No. 6963)

Submitted April 14, 1931. Decided April 21, 1931.
(Rehearing denied June 9, 1931.)

*Strother, Sale, Curd & St. Clair,* for appellants.
*Harmon & Howard,* for appellee.

MAXWELL, JUDGE:

T. L. Pippin and Lula Pippin, his wife, appeal from a decree of the circuit court of McDowell County setting aside and vacating an order whereby the appellants were permitted to adopt Helen Elizabeth Lane, infant daughter of appellee, Audrey Lane.

In January, 1930, Audrey Lane, a single woman about twenty-six years of age, engaged in teaching school in Wyoming County and living with her mother and step-father at Occana, went to Grace Hospital at Welch where she was examined and found to be pregnant. So great was her desire to keep her condition secret that Dr. C. F. Hicks, the physician who examined her, permitted her to remain at the hospital until the birth of the child, May 5, 1930. During her stay at the hospital, prior to her delivery, she had been much worried about what should be done with the child after its birth. She seemed unwilling to take the child to her home; in fact she did not want her mother to know anything about the unfortunate affair. Through the kindness of one of the nurses at the hospital Miss Lane was informed that Mr. and Mrs. Pippin wanted to adopt a baby and arrangements were subsequently made whereby on May 6, 1930, the day after the infant's birth, appellants came to the hospital and appellee by a formal writing consented to the adoption. With her like consent they immediately took the child from the hospital to their home. At the succeeding June term of the circuit court of McDowell County an adoption proceeding was regularly conducted and an order authorizing the adoption was entered, and the child's name was changed from Helen Elizabeth Lane to Helen Elizabeth Pippin. At the September term of the court, appellee petitioned to have the order of adoption set aside on two grounds, first, that at the time she gave her consent to the adoption she was incapable of exercising her reason and judgment in the matter, and second, that appellants were not fit and proper persons to rear

the child, a fact not known to her at the time she gave her consent as aforesaid. In December the court granted the prayer of the petition, at the same time requiring appellee to pay appellants $150.00 for their care of the child.

An examination of the evidence relative to the state of mind of appellee, both prior and subsequent to the birth of the infant, shows a marked inclination on her part to shield and protect herself from the embarrassment which would follow the discovery of her situation. This desire for secrecy militates against her in her present protestations that she did not consent to the permanent adoption of the child. The evidence of the doctor who treated her as well as that of several of the hospital nurses tends to support the proposition that appellee in her frantic condition was not averse to destroying the unborn child had opportunity afforded. It is not clear from the evidence that she had fully made up her mind to let the child go, immediately prior to actually signing the writing giving her consent; but the evidence is clear and preponderating that this writing was read and explained to her and that opportunity was given her to read it herself, and that she signed and acknowledged it upon a full and fair disclosure of its contents, and with seeming thorough understanding by her of its meaning and purport. The writing recites in effect that she, Audrey Lane, consented to the adoption of her child by appellants and acknowledged service of notice that appellants would present a petition for adoption to the circuit court of McDowell County on the first day of the June, 1930, term of said court. Appellee testifies that due to the travail of childbirth and the effects of the anesthetic which had been administered to her she was not in full possession of her mental faculties at the time she executed the paper. It appears that the child was born the night previous at about nine o'clock, and that she was under the anesthetic about eight minutes. She signed the paper the next morning about ten o'clock. The doctor and nurses who waited upon her that morning testify to the normalcy of her mental condition.

Appellee further testifies that within about two weeks after the birth of the child, she wrote to its foster parents re-

questing its return, and that she likewise wrote to Dr. Hicks. Appellants say they did not receive this letter, but Dr. Hicks replied to the one written him and advised her to consult a lawyer. In any event she was not present in court in June when the adoption was consummated. She says she did not realize that a court proceeding was necessary.

Mrs. Pippin had been twice married and twice divorced before her present marriage. Imputation of impropriety on the part of Mrs. Pippin which is sought to be raised by the petitioner in relation to each of the two prior marriages, is emphatically denied by Mrs. Pippin. Without going into the merits of that particular controversy, suffice it to say that the testimony of many witnesses tends to prove that both of the appellants are respectable members of the community in which they live and are fitted, both morally and financially, properly to rear the child which has been entrusted to their care. Appellee says she was under the impression that appellants had been married for twenty years or more. They were married in 1927. From 1917 until the marriage (excepting the short time during which she lived with her second husband) Mrs. Pippin had been in the Pippin home as housekeeper and companion for Mr. Pippin's aged mother. A number of witnesses testify to the present well kept condition of the child and the pride which the appellants have in the child and their devotion for it. Appellee lives with her mother and step-father, who is a miner, and until she finds it possible to re-establish herself on an earning basis, she will probably continue to be dependent upon his earnings for sustenance. Mr. Pippin is a man with substantial regular earnings and is amply able to provide for the child and educate it.

It has been repeatedly announced in cases involving the custody of children that the welfare of the child is the polar star by which the courts shall be guided. *State ex rel. Cooke* v. *Williams*, 107 W. Va. 450; *State ex rel. Palmer* v. *Postlewaith*, 106 W. Va. 383; *Connor* v. *Harris*, 100 W. Va. 313; *Fletcher* v. *Hickman*, 50 W. Va. 244. There is nothing in the situation here which seriously impresses us that this child would have better opportunities in facing life if reared by its unfortunate mother than it should have if it remains in

the custody of its foster parents. There are many reasons readily recognizable from the facts recited which cause the belief that it will be better off in its present status.

Adoption proceedings are serious matters and must not be dealt with lightly. While an adoption may be set aside and annulled for fraud (1 Corpus Juris 1392), or where the welfare of the child requires such course to be taken (1 Am. & Eng. Ency. of Law (2nd Ed.), page 735), or where there has been no notice to the parent or parents (Code 1931, 48-4 6), such revocation should not be made merely because a parent or parents, who formally consented to the adoption, subsequently experience a change of mind on the subject. We find nothing in this record which in our judgment warrants an annulment of the adoption here involved. We therefore reverse the decree of the trial chancellor.

*Reversed and rendered.*